**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| STARR INDEMNITY & LIABILITY COMPANY, | ) ) ) | Case No. |
|     Plaintiff, | ) | |
| v. | ) ) | |
| CITY OF DEARBORN, JOHN B. O'REILLY, JR., AND DEBRA WALLING, | ) ) ) | |
|     Defendants. | ) ) | |

_____

## COMPLAINT

Plaintiff Starr Indemnity & Liability Company ("Starr"), through its counsel, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, for its Complaint, states as follows:

## INTRODUCTION AND NATURE OF ACTION

1.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure to determine and resolve questions of actual controversy concerning the availability and scope of insurance coverage for Defendants herein City of Dearborn ("City"), John B. O'Reilly Jr. ("Mr. O'Reilly"), and Debra Walling ("Ms. Walling," collectively "the City Defendants") under a Special Excess Liability

Policy for Public Entities issued by Starr to the City of Dearborn, effective June 30, 2012 to June 30, 2013 (later defined herein as the "Starr Policy").

2.     This action stems from an underlying lawsuit brought against the City, O'Reilly and Walling by April Lynn Fakhoury, Hakim Fakhoury, Michael Fakhoury, and Ray Fakhoury (collectively, "the Fakhourys"), currently pending in the U.S. District Court for the Eastern District of Michigan under Case No. 2:16-cv-13323-GAD-RSW ("the Fakhoury Lawsuit").

3.     On February 11, 2021, following exhaustion of the $1,000,000 self-insured retention in the Starr Policy, Starr agreed to defend the City Defendants in the Fakhoury Lawsuit subject to a full reservation of rights under the Starr Policy and at law.

4.     Starr is currently defending the City Defendants in the Fakhoury Lawsuit under its reservation of rights.

5.     On March 24, 2021, Starr advised the City Defendants that, should the Fakhoury Lawsuit proceed through trial to an adverse verdict, that verdict may not be covered under the Starr Policy.  Starr advised the City Defendants that in order to avoid risking the loss of all insurance coverage owed under the Starr Policy in the event of an adverse verdict in the Fakhoury Lawsuit, the City Defendants were obligated to take steps to ensure that the adverse verdict was allocated between uncovered claims and covered claims (if any).

6.      Subsequent communications from the City's counsel indicate that the City Defendants will likely not take the necessary steps to allocate uncovered from covered claims in a potential verdict.

7.      For the reasons discussed herein, Starr requests that this Court declare the rights and obligations of the parties with respect to insurance coverage (defense or indemnity) available to the City Defendants for the Fakhoury Lawsuit, and take steps to ensure that an adverse verdict, if any, in the Fakoury Lawsuit is properly allocated between uncovered claims and covered claims (if any) as outlined below.

### **THE PARTIES**

8.      Plaintiff Starr is an insurance company incorporated in the State of Texas, with its principal place of business in New York, New York.

9.      Defendant City of Dearborn is a municipality in Wayne County, Michigan.

10.     Defendant John B. O'Reilly, Jr. serves as Mayor of the City of Dearborn.  Mr. O'Reilly is a citizen of Michigan and resides in Wayne County, Michigan.

11.     Defendant Debra Walling is an official in the City of Dearborn.  Ms. Walling is a citizen of Michigan and resides in Wayne County, Michigan.

## JURISDICTION AND VENUE

12.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the controversy is between citizens of different states and the amount in controversy exceeds the minimum jurisdictional amount of $75,000, exclusive of interest and costs.  Jurisdiction is also proper pursuant to 28 U.S.C. §2201, particularly because this action would clarify Starr's obligations, if any, under the Starr Policy, and Starr's obligations, if any, are not at issue in any state court action.

13.    Venue is proper in the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(1), because each of the Defendants are residents of Wayne County, Michigan, which falls within this judicial district.

## GENERAL ALLEGATIONS

### A.  FAKHOURY LAWSUIT

14.    The Fakhoury Lawsuit was filed in the United States District Court, Eastern District of Michigan, Southern Division, on September 23, 2016, bearing the caption *April Lynn Fakhoury, Hakim Fakhoury, Michael Fakhoury, and Ray Fakhoury v. John. B. O'Reilly Jr., Individually, and in his Official Capacity as the Mayor of the City of Dearborn, William M. Debiasi, Individually, Sgt. Andreas Barnette, Individually, Ron Haddad, Individually and in his Official*

4

*Capacity as the Dearborn Police Chief, Debra Walling, Individually, and The City of Dearborn, a Municipality located in Wayne County, State of Michigan.* The pleadings and other papers in the Fakhoury Lawsuit are in writing and constitute the best evidence of their terms. A copy of the First Amended Complaint in the Fakhoury Lawsuit is attached hereto as **Exhibit A**.[1] Starr incorporates the pleadings in the Fakhoury Lawsuit as if set forth herein in their entirety.

15. Pursuant to Opinion and Order issued by the District Court on May 14, 2019, and the November 18, 2020 decision of the United States Court of Appeals for the Sixth Circuit affirming the District Court's order, certain causes of action in the First Amended Complaint were dismissed. The remaining causes of action are Count III - 42 U.S.C. 1983 Violation of the Fourth and Fourteenth Amendments as to All Defendants in Violation of the Equal Protection Clause, and Count IV - 42 U.S.C. 1983 Violation of the First and Fourteenth Amendments as to All Defendants. See Exhibit A.

16. The Fakhoury Lawsuit seeks economic damages, non-economic damages, punitive/exemplary damages, costs, interest and attorney fees, and unspecified equitable relief.

---

[1] The exhibits to the First Amended Complaint are not attached due to their size, but are incorporated in their entirety.

17.  As set forth in detail in Starr's March 24, 2021 letter, the Fakhourys' pleadings, motion papers, affidavits and sworn testimony contain myriad allegations of conduct that potentially falls outside the insuring agreement of the Starr Policy and/or is excluded under the Starr Policy.

18.  Some examples of these potentially uncovered allegations include:

a.  "In a continued display of ill-will, the Mayor also began spreading rumors that Hakim was using 'illegitimate', 'dirty', 'crooked', 'Al-Qaeda' money from 'overseas'" (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13711-12);

b.  "[The Mayor's] personal malice towards Fakhoury lead to Mayor O'Reilly ordering Building and Safety to begin aggressively enforcing city code violations against the Fakhoury-owned buildings, despite the agreement Fakhoury had with the City regarding buildings considered to be 'existing nonconforming'. . . . The reality was that Fakhoury was considered to be on the Mayor's 'bad list' and the Mayor used his departments to 'selective[ly] enforce[]' code violations against Fakhoury-owned properties."  (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13709-10);

c.  "With knowledge that Fakhoury could be found in default for maintaining vacant buildings . . . the Mayor . . . called the president of Fakhoury's bank to inform him that Fakhoury's buildings were vacant."  (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13711);

d.  "According to former assistant prosecutor for City of Dearborn, prosecutors received direction from the Mayor and legal department (Walling) to aggressively prosecute the Fakhoury family regardless of the circumstances, and to not provide any

leniency whatsoever." (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13719).

e. "A meeting [] occurred at Habib's Restaurant between the Mayor and Hamames, where the Mayor told the Hamames if they wanted to do business in the City, the Hamames had to sever their partnership with the Fakhoury family and divest them of their properties in the City." (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13715);

f. "The Mayor announced publicly and wrongfully that the Fakhoury Family no longer owned properties in the district and that this is a new day[] - which caused financial ruin for me and my family, as we no longer were able to correct rent. On April 8th at the WDDDA meeting I went on the record and I pled with Mayor to retract his statement (s) but he refused." (Affidavit of Hakim Fakhoury filed Jan. 14, 2019, ECF No. 119, PageID.12856);

g. "The Mayor also instructed City Council that tenants were required to stop paying the Fakhoury family, and to direct their payments to *the Hamame family.*" (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13719)(emphasis in original).

h. "[The Fakhourys] were intentionally treated different and discriminated against from others similarly situated, including Mike Hamame, with no rational basis for the difference in treatment." (First Amended Complaint, ¶ 127).

i. "On February 12, 2013 (allegedly), the City issued its first [of two] 'Special Intelligence Bulletin' (with the Mayor and the Chief named on the letterhead) labeling the Fakhourys as 'suspect', listing all of their vehicles and properties, and requesting all officers 'to give special attention and extra patrols' to 'any other businesses owned by Fakhoury Ventures,'" and "repeatedly cast[] the Fakhoury family as

'suspects' for months, while the Hamame family as 'victims' in at least two Special Intelligence Bulletins issued internally for all police officers." (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13718);

j. "[City officials] harass[ed] the Fakhoury family for accusations that we defrauded tenants (which was untrue)." (Affidavit of Hakim Fakhoury filed Jan. 14, 2019, ECF No. 119, PageID.12857-8).

k. "[City officials] prohibit[ed] Fakhoury family to collect rents from the disputed properties, while allowing the Hamame family to collect rents from same properties during the time period of the properties being in dispute." (Affidavit of Hakim Fakhoury filed Jan. 14, 2019, ECF No. 119, PageID.12858).

l. "The Mayor and Walling also instructed police officers to have officers stationed in front of the Fakhoury family's home at all times to further intimidate them, as witnessed by neighbors." (Corrected Brief in Opposition to City of Dearborn's Motion for Summary Judgment, ECF No. 122, PageID.13720).

m. "On February 19, 2013 – seven days after the first Special Bulletin was disseminated to the whole police force," "at least four marked police cars surrounded the Fakhoury family [in their vehicle], where they had their lights flashing, and several streets blocked off. According to Fakhoury, several officers drew their guns." (Plaintiffs' Response to Defendant Andreas Barnet's Motion for Summary Judgment, ECF No. 124, PageID.13905).

n. "On March 13, 2013, one of Fakhoury's new tenants (Diana Karnib) was approached by "city inspectors" who placed a "non-occupancy notice" on the property and told her that the building was "condemned" and "being repossessed.' . . . Karnib was then instructed by the City, and Walling, to file a police report against Hakim Fakhoury for fraud." (Plaintiffs' Response

to Defendant Andreas Barnet's Motion for Summary Judgment, ECF No. 124, PageID.13911).

o. "The Mayor endorsed the Hamame family's request to remove the paid parking program which occurred around October 21, 2014 (Exh Z), after the Fakhoury family lost their interest in the properties to the Hamame family just months before in June 2014, [in] another example of how the Hamame family were treated more favorably than the Fakhoury family." (Affidavit of Hakim Fakhoury filed Jan. 14, 2019, ECF No. 119, PageID.12855).

## B. COVERAGE COMMUNICATIONS

19.    By letter dated June 4, 2019, Starr wrote to the City Defendants, reminding them that the retained limit of the Starr Policy had not been exhausted by payment of defense costs or a judgment.  The June 4, 2019 letter reserved Starr's rights and identified certain coverage positions that might limit coverage under the Starr Policy if the retained limit was exhausted.

20.    By letter dated September 13, 2019, Starr again reminded the City Defendants that the retained limit of the Starr Policy had not been exhausted by payment of defense costs or a judgment, and again identified certain coverage positions that might limit coverage under the Starr Policy if the retained limit was exhausted.

21.    By letter dated February 11, 2021, following exhaustion of the retained limit of the Starr Policy, Starr agreed to defend the City Defendants in the Fakhoury Lawsuit subject to a full reservation of rights.

22.     By letter dated March 24, 2021, Starr advised the City Defendants that, should the Fakhoury Lawsuit proceed through trial to an adverse verdict, some or all of the verdict amount may not be covered under the Starr Policy. Starr advised that the City Defendants were obligated under the Starr Policy and at law to allocate between uncovered claims and covered claims (if any) in a potential adverse verdict, or risk the loss of all coverage under the Starr Policy for the Fakhoury Lawsuit in the event of an adverse verdict.  The March 24, 2021 letter invited further discussion between Starr and the City Defendants regarding how to accomplish this allocation.

23.     Subsequent communications with the City Defendants indicate that the City Defendants likely will not take the necessary steps to allocate uncovered from covered claims in a potential verdict.

## C. <u>THE STARR POLICY</u>

24.     Starr issued a Special Excess Liability Policy for Public Entities to the City of Dearborn under Policy No. SISCPEL01840612, effective June 30, 2012 to June 30, 2013 (the "Starr Policy").  The Starr Policy has a limit of $15,000,000 per "wrongful act or employee benefit wrongful act or series of continuous, repeated, or related occurrences, wrongful acts or employee benefit wrongful acts" and in the aggregate.  The Starr Policy has a retained limit of $1,000,000 per "one occurrence or wrongful act or employee benefit

wrongful act or series of continuous, repeated, or related occurrences, wrongful acts or employee benefit wrongful acts."   The Starr Policy is in writing and constitutes the best evidence of its terms.   A copy of the Starr Policy is attached hereto as **Exhibit B**.   Starr incorporates by reference the Starr Policy in its entirety as if fully set forth herein.

25.    The Starr Policy states in relevant part as follows:

Throughout this Policy the words **you** and **your** refer to the Named Insured(s) shown in the Declarations and any other person(s) or organization(s) qualifying as a Named Insured under this Policy.

**SECTION I. COVERAGES**
**A. INSURING AGREEMENTS**
1. BODILY INJURY, PROPERTY DAMAGE AND PERSONAL AND ADVERTISING INJURY LIABILITY
We will pay on your behalf those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages by reason of liability imposed by law because of bodily injury, property damage or personal and advertising injury caused by an occurrence to which this insurance applies. . .

2. ERRORS AND OMISSIONS LIABILITY
We will pay on your behalf those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages to compensate others for loss arising out of your wrongful act to which this insurance applies . . .
                                        ***
**B. DEFENSE**
1. We will have the right and duty to defend the insured against any claim or suit seeking damages for bodily injury, property damage, personal and advertising injury, wrongful acts, employment practice liability wrongful acts or

employee benefit wrongful acts to which this insurance applies when the retained limit has been exhausted by payment to a third party of judgments, settlements or defense costs.

2. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other suit seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any suit seeking damages for bodily injury, property damage, personal and advertising injury, wrongful acts, employment practice liability wrongful acts or employee benefit wrongful acts to which this insurance does not apply.

3. At our discretion, we may investigate any occurrence, wrongful act, employment practice liability wrongful act or employee benefit wrongful act that may involve this insurance and settle any resultant claim or suit for which we have the duty to defend. But:
   a. The amount we will pay for damages is limited as described in SECTION III. LIMITS OF INSURANCE; and
   b. Our right and duty to defend ends when we have used up the applicable Limit of Insurance in the payment of judgments, settlements or defense costs.

**C. DEFENSE COSTS**

1. All expenses we incur in the defense of any claim or suit are included within and erode the Limits of Insurance, except for salaries of our employees, our office expenses, and any expenses of any claims service provider working on our behalf.

2. We will pay, with respect to any claim we investigate or settle, or any suit against an insured we defend, when the duty to defend exists:

                    ***

   b. Costs taxed against any insured in the suit;

                    ***

12

e. Prejudgment interest awarded against any insured on that part of the judgment we pay.[2]

f. Interest on the amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

\*\*\*

## SECTION II. WHO IS AN INSURED

The following persons or organizations are insureds under this insurance:

A. You;

B. Any individual who was previously or is presently elected or appointed as an official of the Named Insured, including members of its governing body or any other agencies, districts, authorities, committees, trustees, boards, commissions, or similar entity of the Named Insured, but only with respect to their duties as an official of the Named Insured;

C. Your employees, past or present, while acting within the course and scope of their employment, or your volunteer workers while performing duties on your behalf;

\*\*\*

## SECTION III. LIMITS OF INSURANCE

A. Limits of Insurance shown in the Declarations and the rules below fix the most we will pay in excess of your retained limit regardless of the number of:

1. Insureds [];
2. Claims made or suits brought; or
3. Persons or organizations making claims or bringing suits.

B. The retained limit stated in the Declarations applies:

\*\*\*

2. Separately to each occurrence, wrongful act, employment practice liability wrongful act or employee benefit wrongful act or series of continuous, repeated, or related

---

[2] As amended by endorsement.

occurrences, wrongful acts, employment practice liability wrongful acts or employee benefit wrongful acts.

\*\*\*

E.  Subject to Paragraph A. above and Paragraph G. below:

1.  The per occurrence, wrongful act, employment practice liability wrongful act or employee benefit wrongful act Limit of Insurance stated in the Declarations is the most we will pay for the sum of all damages, including defense costs, for:

    a.  Bodily injury, property damage or personal and advertising injury arising out of a single occurrence;

    b.  A single wrongful act;

    \*\*\*

4.  The errors and omissions liability aggregate Limit of Insurance stated in the declarations is the most we will pay for the sum of all damages arising out of all wrongful acts other than any personal and advertising injury.

F.  In determining the Limits of Insurance that apply only one of the following will apply to damages or losses of a claim made or suit brought:

1.  All occurrences arising out of continuous, repeated, or related occurrences shall be treated as a single occurrence and Limits of Insurance in effect at the first occurrence shall apply; or

2.  All wrongful acts arising out of continuous, repeated, or related wrongful acts shall be treated as a single wrongful act and Limits of Insurance in effect at the time of the first wrongful act shall apply;

    \*\*\*

**SECTION IV. DEFINITIONS**

\*\*\*

D.  Bodily injury means bodily injury, disability, sickness, or disease sustained by a person, including care, loss of services and death resulting from physical injury to the body. Bodily injury includes mental anguish, mental injury, humiliation, shock or death if resulting from bodily injury.

\*\*\*

P.  Occurrence means as respects:

1. Bodily injury or property damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one occurrence.
2. Personal and advertising Injury, an offense arising out of your business that causes personal and advertising injury. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one occurrence, regardless of the frequency or repetition thereof, the number or kind of media used or the number of claimants.

*** 

R. Personal and advertising injury means injury, including consequential bodily injury, arising out of one or more of the following offenses:
   1. False arrest, detention or imprisonment;
   2. Malicious prosecution;
   3. Oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person or organization's goods, products, or services;
   4. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
   5. Violation of an individual's person's right to privacy;
   6. Assault and battery;
   7. Oral or written publication, in any manner, of material that violates a person's right of privacy;

***

X. Retained limit refers to the amount stated in the Declarations. This amount may consist of a self-insured retention, underlying insurance, or a combination thereof. The retained limit will be the sum of all damages for:
   1. Bodily injury, property damage or personal and advertising injury arising out of each such occurrence;
   2. Each such wrongful act;
   3. Each such employment practice liability wrongful act; or
   4. Each such employee benefit wrongful act.

15

In determining the retained limit that applies only one of the following will apply to the damages or losses of a claim or suit brought:

1. all occurrences arising out of continuous, repeated, or related occurrences shall be treated as a single occurrence and the retained limit in effect at the first occurrence shall apply.

2. All wrongful acts arising out of continuous, repeated, or related wrongful acts shall be treated as a single wrongful act and the retained limit in effect at the time of the first wrongful act shall apply.

***

The retained limit, with respect to a self-insured retention, shall include defense costs.  The retained limit shall not include salaries of your employees, your office expenses, or expenses of any claims servicing organizations that you have engaged. However, the retained limit shall include allocated defense costs incurred in the investigation, defense or appeal of a claim or suit to which this insurance applies by attorneys, paralegals, adjusters and investigators who are your employees.

***

DD.   Wrongful act means:

Any actual or alleged error or misstatement, omission, negligent act, or breach of duty including misfeasance, malfeasance, and nonfeasance by you, including, but not limited to, those constituted by:

***

2. Any negligent ministerial act;

***

4. Discrimination on any basis, including, but not limited to: race, creed, religion, ethnic background, national origin, age, handicap, sex or sexual orientation; but not intentionally committed by you or at your direction.

***

## SECTION V. EXCLUSIONS

***

B. This insurance does not apply to any liability for any personal and advertising injury arising out of a breach of contract,

except an implied contract to use another's advertising idea in your advertisement;

***

G. This insurance does not apply to any liability arising out of criminal, fraudulent, dishonest or malicious acts or omissions committed by or at the direction of the insured.  We may, at our sole discretion, agree to waive this exclusion in order to supply certain payments under Paragraph C. DEFENSE COSTS of SECTION I. COVERAGES. If the judgment or final adjudication is adverse to you, you will reimburse us for all defense costs.

This exclusion does not apply to liability arising from the managerial, advisory, supervisory, or controlling obligations of any insured over the actions of another insured;

H. This insurance does not apply to any liability arising out of your wrongful act for gain, profit, or advantage to which you are not legally entitled.  We may, at our sole discretion, agree to waive this exclusion in order to supply certain payments under Paragraph C. DEFENSE COSTS of SECTION I. COVERAGES as respect to any claim or suit arising from an alleged criminal, fraudulent, dishonest or malicious act or omission committed by or at the direction of you, for any claim or suit arising out of your wrongful act for gain, profit, or advantage to which you are not legally entitled until final adjudication, judgment or settlement to which we have agreed. If the judgment or final adjudication is adverse to you, you will reimburse us for all costs associated with the defense.

This exclusion does not apply to liability that any insured has with regard to the managerial, advisory, supervisory, or controlling obligations over the actions of another insured;

***

K. This insurance does not apply to any liability for injunctions, equitable relief, or any other form of relief other than the payment of money damages;

***

X. This insurance does not apply to any liability for personal and advertising injury:

17

1. Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; or

2. Arising out of oral or written publication of material whose first publication took place before the beginning of the Policy Period. All personal and advertising injury arising out of publication of the same or similar material subsequent to the beginning of the Policy Period is also excluded.

See Exhibit B.

## COUNT I – DECLARATORY JUDGMENT
## UNDER THE STARR POLICY

26.    Starr incorporates by reference the allegations in the foregoing paragraphs in their entirety as if fully restated herein.

27.    The Starr Policy identifies as an insured "[a]ny individual who was previously or is presently elected or appointed as an official of the Named Insured . . . but only with respect to their duties as an official of the Named Insured."

28.    To the extent the Fakhoury Lawsuit results in liability against Mr. O'Reilly outside of his duties as an official of the City, Mr. O'Reilly is not an insured under the Starr Policy.

29.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability against Mr. O'Reilly outside of his duties as an

official of the City, Starr has no duty to indemnify the City or Mr. O'Reilly for that portion of the verdict.

30.    To the extent the Fakhoury Lawsuit results in liability against Ms. Walling outside of her duties as an official of the City, Ms. Walling is not an insured under the Starr Policy.

31.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability against Ms. Walling outside of her duties as an official of the City, Starr has no duty to indemnify the City or Ms. Walling for that portion of the verdict.

32.    The Starr Policy provides insurance coverage for "those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages to compensate others for loss arising out of your wrongful act to which this insurance applies."  A wrongful act is defined in the Starr Policy as "[a]ny actual or alleged error or misstatement, omission, negligent act, or breach of duty including misfeasance, malfeasance, and nonfeasance by you, including, but not limited to, those constituted by . . . [a]ny negligent ministerial act; [or] [d]iscrimination on any basis, including, but not limited to: race, creed, religion, ethnic background, national origin, age, handicap, sex or sexual orientation; but not intentionally committed by you or at your direction."

33.    To the extent the Fakhoury Lawsuit does not result in damages for loss arising out of an insured's wrongful act, as that term is defined in the Starr Policy, there is no coverage for any of the City Defendants under the Starr Policy under this coverage grant.

34.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability other than for loss arising out of an insured's wrongful act, Starr has no duty to indemnify the City, Mr. O'Reilly or Ms. Walling for that portion of the verdict under this coverage grant.  In particular, to the extent that any portion of an adverse verdict reached in the Fakhoury Lawsuit encompasses intentional discrimination, Starr has no duty to indemnify the City, Mr. O'Reilly or Ms. Walling for that portion of the verdict.

35.    The Starr Policy provides coverage for "those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages by reason of liability imposed by law because of bodily injury, property damage or personal and advertising injury caused by an occurrence to which this insurance applies."  To the extent the Fakhoury Lawsuit does not result in bodily injury, property damage or personal and advertising injury caused by an occurrence, there is no coverage for any of the City Defendants under the Starr Policy under this coverage grant.

36.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability other than bodily injury, property damage or personal and advertising injury caused by an occurrence, Starr has no duty to indemnify the City, Mr. O'Reilly or Ms. Walling for that portion of the verdict under this coverage grant.

37.    The Starr Policy excludes coverage for "personal and advertising injury arising out of a breach of contract."  To the extent the Fakhoury Lawsuit results in damages for personal and advertising injury arising out of a breach of contract, coverage is excluded.

38.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for personal and advertising injury arising out of a breach of contract, Starr has no duty to indemnify the City, Mr. O'Reilly or Ms. Walling for that portion of the verdict.

39.    The Starr Policy excludes coverage for "any liability arising out of criminal, fraudulent, dishonest or malicious acts or omissions committed by or at the direction of the insured."  To the extent the Fakhoury Lawsuit results in liability arising out of criminal, fraudulent, dishonest or malicious acts or omissions committed by or at the direction of the insured, coverage is excluded.

40.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability arising out of criminal, fraudulent, dishonest or malicious acts or omissions committed by or at the direction of the insured, Starr has no duty to indemnify the City, Mr. O'Reilly or Ms. Walling for that portion of the verdict.

41.    The Starr Policy excludes coverage for "any liability arising out of your wrongful act for gain, profit, or advantage to which you are not legally entitled."  To the extent the Fakhoury Lawsuit results in liability arising out of an insured's wrongful act for gain, profit, or advantage to which the insured(s) are not legally entitled, coverage is excluded.

42.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability arising out of a wrongful act for gain, profit, or advantage to which the insured(s) are not legally entitled, based on the above-noted allegations or otherwise, Starr has no duty to indemnify the City, Mr. O'Reilly or Ms. Walling for that portion of the verdict.

43.    The Starr Policy excludes coverage for personal and advertising injury " arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity."  To the extent the Fakhoury Lawsuit results in damages for personal and advertising injury

arising out of oral or written publication of material done by or at the direction of the insured with knowledge of its falsity, coverage is excluded.

44.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for personal and advertising injury arising out of oral or written publication of material if done by or at the direction of the insured with knowledge of its falsity, Starr has no duty to indemnify the City, the Mayor or Walling for that portion of the verdict.

45.    The Starr Policy provides coverage for those sums that the insured becomes "legally obligated to pay as damages."  There is no coverage under the Starr Policy for the categories of requested relief in the Fakhoury Lawsuit that do not qualify as damages, such as costs, attorney's fees, or equitable relief.  Accordingly, to the extent an award of costs, attorney's fees or equitable relief is made as part of an adverse verdict in the Fakhoury Lawsuit, Starr has no obligation to indemnify the City, Mr. O'Reilly or Ms. Walling for such an award.

46.    To the extent any portion of an adverse verdict reached in the Fakhoury Lawsuit is for liability other than bodily injury, property damage, personal and advertising injury, or wrongful acts to which this insurance applies, or is otherwise excluded by the Starr Policy, Starr is entitled to reimbursement of defense costs paid by Starr in whole or in part.

47.     The Starr Policy provides that "all occurrences arising out of continuous, repeated, or related occurrences shall be treated as a single occurrence and Limits of Insurance in effect at the first occurrence shall apply," and that "all wrongful acts arising out of continuous, repeated, or related wrongful acts shall be treated as a single wrongful act and Limits of Insurance in effect at the time of the first wrongful act shall apply."  To the extent coverage exists under the Starr Policy for any portion of an adverse verdict in the Fakhoury Lawsuit, all continuous, repeated, or related occurrences or wrongful acts shall be treated as a single occurrence or wrongful act and only the limit of insurance in effect at the time of the first occurrence or wrongful act applies.

48.     Insurance coverage may also be limited or excluded under the Starr Policy to the extent any other terms, definitions, exclusions, conditions and endorsements of the Starr Policy not specifically identified herein apply to limit coverage, in whole or in part, for the Fakhoury Lawsuit.

WHEREFORE, Plaintiff Starr Indemnity & Liability Company respectfully requests the following relief:

A.     A declaration that Starr has no duty to indemnify the City, the Mayor or Walling under the Starr Policy for that portion of any adverse verdict in the Fakhoury Lawsuit that falls outside the insuring agreement of the Starr Policy, and/or that is excluded under the Starr Policy;

B.   A declaration that Starr is entitled to reimbursement of defense costs it has expended relating to any portion of an adverse verdict that is for liability other than bodily injury, property damage, personal and advertising injury, or wrongful acts to which this insurance applies or is otherwise excluded by the Starr Policy.

C.   Such other relief as the Court deems just and equitable.

Respectfully submitted,

*s/ Charles W. Browning*
Charles W. Browning (P32978)
Stephanie M. Brochert (P81710)
PLUNKETT COONEY
38505 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304
(248) 901-4000
cbrowning@plunkettcooney.com
sbrochert@plunkettcooney.com
***Attorneys for Plaintiff***

Dated:  April 20, 2021

Open.22478.91130.26167928-1

25